Filed 7/26/23  P. v. Carter CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RICHARD CARTER,<br><br>Defendant and Appellant. | B316233<br><br>(Los Angeles County<br>Super. Ct. No. NA102814) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James D. Otto, Judge.  Affirmed; remanded with directions.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Richard Carter of seven counts of attempted murder and other charges and found gun enhancements to be true. He contends (1) no substantial evidence supports three of the convictions; (2) the court erred in admitting preserved testimony of two absent witnesses; (3) the court erred in admitting evidence of custodial interrogations; (4) the court erred in failing to offer a jury instruction on a lesser included offense; (5) his sentence was unlawful in one respect; and (6) he is entitled to remand for resentencing under new law. We agree with the sentencing claims, and will thus affirm the judgment but remand for resentencing.

## BACKGROUND

### I.     FACTS

On four nights in 2015, Carter shot at seven people, a car, a restaurant, and a dwelling.

#### A.     The Shootings

##### 1.     Vehicle Shooting, August 16, 2015

At approximately 1:00 a.m. on August 16, 2015, Carter was riding a bicycle on the street. Reaching a corner, he stepped off the bike and shot at a car from approximately 40 feet away. Jose Martinez was driving the car, with Edwin Jurado in the front passenger seat and Ivan Santos in the back. Carter's shots hit the windshield and right side headlight and fender, and struck Jurado in the leg and put a hole in Martinez's pants leg. Jurado identified Carter at a preliminary hearing, and DNA from a glove recovered at the scene tied him to the shooting.

##### 2.     Restaurant Shooting, September 1, 2015

At a little past midnight on September 1, 2015, Carter rode his bicycle near the Taqueria Los Primos restaurant. Carlos Soto and Blanca Guerrero were exiting the restaurant and Francisco

Robledo was skateboarding nearby.  Soto, a gang member and concededly intoxicated and believing Carter to be a rival gang member, called out a derogatory gang slur, "fuck slobs."

When Carter reached the corner at the end of the restaurant parking lot, he started shooting toward the restaurant.  Soto hid behind a car, Guerrero ducked down by her bike, and Robledo hid behind a palm tree.  Soto was grazed by a bullet.  Guerrero was uninjured and heard no bullets strike nearby.  Robledo was uninjured but heard something hit the tree.

Responding Police Officer Patrick Lyon observed bullet holes in the windows of the restaurant and "strike marks" on and near the palm tree.  At least one of the bullets striking the restaurant hit where Guerrero had recently stood.

### 3. Garage Shooting, September 26, 2015

On September 26, 2015, Carter was smoking marijuana in a residential garage with his girlfriend.  They began to fight and Carter fired three shots into the air, striking the garage ceiling but failing to penetrate into the residence above.

### 4. Busani Shooting, October 3, 2015

On October 3, 2015, Carter, standing near a street, shouted "fuck chongos" and shot four times at Luis Busani, who was riding his bike, striking Busani in the head and arm.

### 5. The Victims

The seven victims were thus as follows:  Jose Martinez, Edwin Jurado and Ivan Santos in the vehicle shooting, Jurado receiving a leg wound and Martinez a hole in his pants leg; Francisco Robledo, Carlos Soto and Blanca Guerrero in the restaurant shooting, Soto receiving a graze wound; and Luis Busani, who was seriously injured.

## B.    Arrest and Investigation
### 1.    Arrest

On October 8, 2015, Carter pointed a gun at Terrence Howlett, who had just exited his tent with his friend "Red." Speaking what Howlett characterized as gibberish, Carter told Howlett he was on a "genocide" to protect Black people from Mexicans, and was wanted for four or five murders already. He accused Howlett of being a snitch and threatened to shoot him and rape Red. Carter instructed Howlett to empty his pockets and leave.

Howlett left and called police. Responding Police Officer Jose Rios accompanied him back to his tent, from which Carter emerged. Police seized two bullets and a bag of methamphetamine from Carter's person and a handgun from the tent. Forensic analyses revealed that the bullets fired at the four shootings all came from this gun.

### 2.    Jailhouse Statements

Carter was initially charged with crimes pertaining only to the Howlett incident: assault with a firearm, possession of a controlled substance with a firearm, possession of a firearm with priors, attempted second degree robbery with person present, and first-degree burglary with person present.

Police planted undercover agents in Carter's jail cell. In surreptitiously recorded conversations, Carter admitted his involvement in several of the shootings and stated he was fighting against a "genocide" being committed against Black people. Regarding the shooting outside Los Primos restaurant, Carter admitted he was there but said he had been "rushed, by about 15 or 20 individuals," and he merely defended himself. He stated, "Yeah and I wasn't even really looking, I was just riding

4

by shooting as the motherfuckers advanced at me and that's why only the fat one got shot."

The prosecution later dismissed these initial charges and filed charges pertaining to the four shootings.

### 3. Conditional Examinations of Soto and Howlett, and Due Diligence Hearing

#### a. Soto

Carter was arrested on October 8, 2015. He was initially represented by the Office of the Public Defender but that office declared a conflict of interest on November 16, 2016, and the alternate public defender's office was appointed.

By this time, all sides knew that Carlos Soto, a victim of the shooting outside Los Primos restaurant, was in danger of deportation. On November 29, 2016, he was taken out of custody and testified in a conditional examination about the restaurant shooting.

Soto was deported on April 25, 2017.

In 2019, the alternate public defender declared a conflict and a bar panel attorney was assigned to represent Carter. In April 2021, the prosecutor indicated he intended to introduce Soto's conditional hearing testimony without calling him as a witness.

#### b. Howlett

Howlett, who was homeless, had tried to avoid testifying at the preliminary hearing, saying he feared for his life. By April 2017, he had left California with apparently no intention of returning.

On June 2, 2017, Howlett nevertheless testified at a conditional examination concerning events on the day Carter was arrested.

Because the prosecution proposed at trial to offer the conditional examination testimony of Soto and Howlett, the court held a contested due diligence hearing to determine whether reasonable efforts had been made to locate and produce them.

Detective Shea Robertson testified he began looking for Soto in March 2021. He ran Soto's name through local and national databases, learning he had been either removed or deported on April 25, 2017. Although there was an active warrant for his arrest, Soto had not been arrested in the United States since his removal. Robertson believed Soto was deported to Mexico but found no address for him. No parole contacts were documented and no local coroner's cases involving Soto were discovered. Robertson did not attempt to contact Soto's friends, family, or associates within the United States.

Detective Donald Collier testified he began trying to locate Howlett in March 2021. He called multiple phone numbers associated with Howlett and sent an email to his purported address but achieved no results. Detective Collier determined that Howlett's last known address was in Sparks, Nevada, and he had been arrested in nearby Reno on February 12, 2021. Detective Collier contacted the Reno Police Department for assistance. He spoke to Sergeant Laura Conklin, who assigned some bike patrol officers to go to Sparks, but by April 20, 2021, the day jury selection began, police were unable to find Howlett. The Washoe County coroner's office (which covers Reno and Sparks) had no record of Howlett being deceased.

The trial court ruled that the prosecution met its burden of showing both Soto and Howlett were unavailable, and ordered

that the conditional examination testimony of each could be introduced at trial.

### C.  Trial

Carter was tried on seven counts of attempted willful, deliberate, and premeditated murder and three counts of shooting at an inhabited dwelling and occupied motor vehicle, and it was alleged he intentionally discharged a firearm during the crimes.  (Prior prison allegations and the counts related to events on the day of his arrest had been dismissed in the interest of justice.)  His defense was misidentification.

A transcript of Soto's conditional hearing testimony was read to the jury.  In it, Soto used a map to describe where he and Carter were positioned near the restaurant at the time of the shooting.  He admitted he was intoxicated and shouted a gang slur at Carter, and testified Carter did not look where he was shooting.

A videotape of Howlett's conditional hearing testimony was played for the jury.  In it, he detailed the interaction between himself and Carter on October 8, 2015, denied that the gun found in his tent belonged to him, and stated that Carter admitted he was wanted for four murders and was "committing a genocide protecting the Black people and killing Mexicans."

The prosecution also introduced several prior consistent statements made by Howlett via responding Officer Jose Rios.  The court instructed the jury that these statements could be considered only to assess the credibility of Howlett's testimony at the conditional hearing.

In closing, defense counsel indicated that Carter had been homeless for a substantial period and suffered from substance abuse disorder.

7

The jury convicted Carter on all counts, separately found that he acted willfully, deliberately, and with premeditation with respect to the seven attempted murders, and found true all gun use allegations.

On November 2, 2021, the trial court sentenced Carter to a total of 168 years and four months to life in prison. We will discuss details of this sentence as they become pertinent.

Carter appeals.

## DISCUSSION

## I. Sufficiency of the Evidence of Attempted Murders of Santos, Guerrero and Robledo

Carter contends his convictions for the attempted murders of Ivan Santos, who was sitting in the back seat of Martinez's car during the vehicle shooting, and Blanca Guerrero and Francisco Robledo, from the restaurant shooting, all of whom were uninjured, must be reversed based on insufficiency of the evidence. He argues that because no evidence indicates Carter aimed at or said anything to these victims, the jury's finding that he acted willfully, deliberately and with premeditation with respect to them is unsupported. We disagree.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

A conviction for attempted murder requires proof that the defendant intended to kill the victim and a direct but ineffectual act toward accomplishing that goal. (*People v. Perez* (2010) 50

8

Cal.4th 222, 229.) " ' "[G]uilt of attempted murder must be judged separately as to each alleged victim." ' [Citations.] '[T]his is true whether the alleged victim was particularly targeted or randomly chosen.' " (*Id*. at p. 230.)

An intentional attempted killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse. (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1264.)

"Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)

Premeditation may be inferred from the defendant's planning activity, prior relationship to the victim, and manner of committing the crime. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1019.)

A jury may, for example, determine whether premeditation exists "from a consideration of the type of weapon employed and the manner of its use; the nature of the wounds suffered by the [victim]; the fact that the attack was unprovoked and that the [victim] was unarmed at the time of the assault; the conduct of [the] assailant in . . . neglecting to aid [the victim,] . . . and [the assailant's] immediate flight thereafter from the scene of the assault." (*People v. Cook* (1940) 15 Cal.2d 507, 516.)

The act of obtaining a weapon is evidence of planning consistent with a finding of premeditation and deliberation. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082.)

Here, Carter obtained a handgun and carried it for months, which is consistent with premeditation and deliberation.

Carter admitted to undercover police agents and Howlett that he harbored race-based antipathies. He told Howlett he intended to kill Mexicans, and told police agents that he was resisting a Black genocide. This reflects premeditation, deliberation and willfulness.

Carter fired several shots that struck within a few feet of where Santos sat in the back seat of Martinez's car, and shot a palm tree behind which Robledo hid and a restaurant window where Guerrero had recently stood. The shots at Martinez's car came from about 40 feet away. The shots at the restaurant came from outside a corner of the parking lot. (Although the record does not indicate the size of the parking lot, we may presume it was at least large enough for two cars to drive and others to park.) And though the record does not indicate how far Carter was standing from the tree, an urban tree is usually a relatively narrow target. In sum, the evidence suggests that Carter's shots were relatively accurate. The shots at Santos and Guerrero came from a fair distance away and struck close to where Santos sat and where Guerrero had recently stood. The shot at Robledo struck the tree behind which he hid. This suggests that Guerrero targeted these victims. " 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

Carter adduces several circumstances that show he exhibited at most a conscious disregard for the risk of serious injury or death to these three victims: He did not know or address them, and not only did not injure them but shot at other people entirely. In fact, Carter argues, Soto testified that Carter

10

did not even look where he was shooting.  He argues that bullets landing near other individuals were too far away to evince intent to kill Santos, Guerrero and Robledo.

But " ' "the fact that the victim may have escaped death because of the shooter's poor marksmanship" ' " does not necessarily establish a less culpable state of mind.  (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.)  Whether circumstances consistent with innocence are persuasive is a question for the jury.  "[T]he relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt, but whether *any* rational trier of fact could have been persuaded beyond a reasonable doubt that defendant premeditated the murder."  (*People v. Perez* (1992) 2 Cal.4th 1117, 1127; see also *People v. Reed* (2018) 4 Cal.5th 989, 1006-1007.)  We may not substitute our judgment for that of the jury.  (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

Possession of a weapon, admitted antipathies, and multiple relatively accurate shots constitute substantial evidence of willfulness, deliberation, and premeditation.

## II.     Conditional Examination Testimony of Soto and Howlett

Carter contends that introduction of the conditional examination testimony of Soto and Howlett violated his confrontation right.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)  He argues introduction of the several-years-old testimony of these absent witnesses hindered his trial counsel's ability to cross-examine either witness or formulate a trial strategy, and in the case of Soto (who was not videotaped), deprived the jury of an opportunity to assess the witness's demeanor.  We disagree.

11

### A. Carter's Claim is not Forfeited

Respondent preliminarily argues that Carter forfeited his constitutional argument because he failed to raise it at the hearing.

On the contrary, at the due diligence hearing, defense counsel asked the court to consider *People v. Sandoval* (2001) 87 Cal.App.4th 1425, 1443 and *People v. Sanchez* (2016) 63 Cal.4th 411, 442 before ruling. The trial court agreed to do so and later indicated it had done so. *Sandoval* analyzed the prosecution's due diligence responsibilities with respect to unavailable witnesses and the Confrontation Clause, and the page in *Sanchez* to which defense counsel referred cited the constitutional holding in *Sandoval*. Defense counsel's invocation of *Sandoval* and *Sanchez* therefore preserved the constitutional dimension of Carter's evidentiary challenge. (See *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [to the extent the question of forfeiture is a close call, the appellate court is to assume the issue is preserved].)

### B. Applicable Law

Under the Confrontation Clause, a testimonial statement of a witness who is absent from trial is admissible where the declarant is unavailable and the defendant has had a prior opportunity to cross-examine. (*Crawford v. Washington* (2004) 541 U.S. 36, 59; see Evid. Code, § 1291.) A witness will not be deemed unavailable unless the prosecutorial authority "has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5); *People v. Cromer* (2001) 24 Cal.4th 889 (*Cromer*).) Although Evidence Code section 240 refers to "reasonable diligence," courts often describe the analysis as one involving

"due diligence."  (*People v. Bunyard* (2009) 45 Cal.4th 836, 849, 897.)

In reviewing whether the prosecution exercised reasonable diligence in its unsuccessful efforts to locate a missing witness so that the prosecution could use the witness's prior testimony at trial without violating defendant's constitutional right of confrontation, the first inquiry is a matter of determining the historical facts—a detailed account of the prosecution's failed efforts to locate the absent witness.  Those facts will rarely be in dispute.  When they are, we apply a deferential standard of review to the trial court's factual findings.  (*Cromer*, *supra*, 24 Cal.4th at p. 900.)  We independently determine whether these historical facts amount to due diligence.  (*Id*. at p. 901.)  To do so we consider " 'whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised.' "  (*People v. Sanders* (1995) 11 Cal.4th 475, 523.)

### C.     Proceedings Below

Here, detectives testified to substantial efforts made over a period of about a month to locate Soto and Howlett.

Detective Robertson testified he ran Soto's name through local and national databases and learned he had been deported to Mexico but could not locate him there.  Detective Collier testified he tried multiple phone numbers associated with Howlett and sent him an email, and after learning he had been arrested in Reno, sent Nevada police to his last known address.

### D.     Discussion

We conclude that even though these searches were conducted for only about a month, they were timely begun and reasonably diligent in scope.  It does not take long to conduct an exhaustive digital search for someone.

13

Carter argues the prosecution should have started earlier and done more to secure the witnesses' attendance after they became absent. For example, Carter argues, if the prosecution had started its search for Howlett a month earlier it would have found him in a Reno jail cell, and could have easily secured his attendance via interstate processes. And if the prosecution had started its search for Soto earlier it might have been able to elicit cooperation from Mexico.

But nothing in the record suggests that the witnesses would have been found and produced if other avenues had been explored. For example, nothing affirmatively suggests that Soto was still in Mexico or even still alive, or that Howlett, who had a history of homelessness, actually lived at his last known address in Sparks, Nevada.

Carter relies on *Cromer*, which held that a search conducted only a month before trial was untimely. *Cromer* is distinguishable. There, a man at the witness's former home told a prosecution investigator that the witness was living with her mother. The investigator waited two days before driving to the mother's home, where a woman said the mother was out but would return the next day. She also said the witness did not live there, and she had no idea where she was. The investigator never returned and made no further effort to speak to or locate the witness's mother, for example by calling or visiting her at work. (*Cromer*, *supra*, 24 Cal.4th at pp. 903-904.)

The detectives here had less to go on than did the investigator in *Cromer*: Their witnesses were either out of state or out of the country, no one told them where either Howlett or Soto lived. Arguably, the detectives could have started their

14

investigations earlier and done more but nothing in the record indicates that further measures would have been fruitful.

Carter argues that investigators should have tried to contact Mexican authorities and Soto's known relatives and associates in the United States for assistance in conducting a search. They should also have posted a notice at Howlett's last known address or at least ensured that the Nevada officers had actually visited the address.

But we will not reverse a finding of unavailability " 'simply because the defendant can conceive of some further step or avenue left unexplored by the prosecution. Where the record reveals . . . that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually . . . with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable." [Citations.] The law requires only reasonable efforts, not prescient perfection.' [Citations.] 'That additional efforts might have been made or other lines of inquiry pursued does not affect [a] conclusion [there was due diligence] . . . . It is enough that the People used reasonable efforts to locate the witness.' " (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

Carter argues the prosecution was required to prevent the witnesses from becoming absent, for example by undertaking surveillance, independently verifying their predicted further whereabouts, delaying deportation, invoking mutual assistance measures with Mexico, or making use of the Uniform Act to Secure the Attendance of Witnesses without the State in Criminal Cases (Pen. Code, §§ 1334-1334.6).[1] We disagree. The

---

[1] Undesignated statutory references will be to the Penal Code.

15

time between arrest and trial was five and a half years. The prosecution owed no duty to keep tabs on unwilling or unable witnesses for five years.

### E.    Prejudice

Even were Soto's and Howlett's testimony inadmissible, reversal is not required if the record shows beyond a reasonable doubt that Carter suffered no prejudice. (*People v. Foy* (2016) 245 Cal.App.4th 328, 350.) Under this standard, respondent must demonstrate beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. (*Chapman v. California* (1967) 386 U.S. 18, 24.) " ' "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the . . . verdict actually rendered in this trial was surely unattributable to the error." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

To determine whether a confrontation clause violation is harmless beyond a reasonable doubt, courts consider "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.)

Here, Howlett's testimony was either irrelevant or superfluous. He described his interactions with Carter, denied

16

that the gun belonged to him, and stated that Carter admitted he was wanted for four murders as part of a "genocide protecting the Black people and killing Mexicans."  Howlett's interactions with Carter were irrelevant because the charges pertaining to them were dismissed before trial.  His denial about the gun, i.e., his intimation that the gun belonged to Carter, was superfluous because Carter admitted to undercover agents that he committed the restaurant shooting, and ballistics evidence tied that shooting to the others, including the Martinez shooting, where DNA evidence pertaining to Carter was also found.  Further, police found cartridges for the gun on Carter's person when he was arrested.  Because substantial independent evidence tied Carter to the gun, Howlett's intimation that the gun belonged to Carter was superfluous beyond a reasonable doubt.

Carter's admission to Howlett about genocide and murder were also irrelevant or superfluous because Carter had not committed any murders, nothing about the shootings indicated he targeted the victims as part of a Mexican genocide, and Carter also admitted to police agents that he felt he was engaged in a racial war.

Carter argues that Howlett's testimony was the only evidence establishing either premeditation or, in the case of the restaurant and car shootings, an intent to kill.  For the reasons discussed above, the argument is without merit.

Soto's testimony added nothing the jury did not already know.  Although he was the only person to identify Carter as the restaurant shooter, Carter was also linked to that shooting by ballistic evidence—bullets fired at the restaurant came from the gun in his possession when he was arrested—and his own admissions to undercover agents.

17

Carter argues that Soto's testimony was the chief component contradicting Carter's claim that when he fired at the restaurant he was defending himself against an attack. But no evidence suggested he was defending himself. Neither Robledo nor Guerrero said anything about Carter being attacked. On the contrary, only Soto himself suggested Carter was attacked—by Soto. Soto's claim to have verbally attacked Carter only bolstered Carter's claim that he was attacked.

On this record, any error in admitting Howlett's or Soto's testimony was harmless beyond a reasonable doubt.

## III.  Admission of Custodial Interrogations

Carter argues his rights against self-incrimination and to due process and the presence of counsel were violated by the introduction of custodial interrogations by undercover police agents. (U.S. Const., 5th, 6th & 14th Amends.; Cal. Const., art. I, § 7.) Carter concedes that binding caselaw is against him on this point but calls for the California Supreme Court to reconsider the constitutionality of deceptive police tactics that skirt requirements set forth by *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

We preliminarily note that Carter has forfeited the argument by failing to make it below. (*People v. Kennedy* (2005) 36 Cal.4th 595, 612.)

His claim fails on the merits too.

Under *Miranda* and its progeny, " ' "the accused must be adequately and effectively apprised of his rights" to remain silent and to have the assistance of counsel [prior to a custodial interrogation]. [Citation.] "[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him

18

during interrogation thereafter may not be admitted against him at his trial" [citation], at least during the prosecution's case-in-chief [citations].' " (*People v. Nelson* (2012) 53 Cal.4th 367, 374, 377.)

However, as our Supreme Court has observed, "[b]oth 'custody' and 'police questioning' are necessary to invoke *Miranda*, and both concepts are viewed from the suspect's perspective." (*People v. Tate* (2010) 49 Cal.4th 635, 685-686.) "*Miranda's* aim is to ensure that the suspect's will to remain silent is not overborne by the coercive atmosphere of *police questioning* in custody." (*Id.* at p. 686.) Consequently, "voluntary statements to someone the suspect does not believe is a police officer or agent, in a conversation the suspect assumes is private, simply does not involve one of these two critical concerns" of custody and police questioning, and *Miranda* is inapplicable in such a case "even if a suspect happens to be in custody" at the time that person makes inculpatory statements. (*Id.* at pp. 685-686.)

*Tate* controls here, and we are bound to follow it. (*Tanguilig v. Bloomingdale's, Inc.* (2016) 5 Cal.App.5th 665, 673.) We therefore cannot accept Carter's invitation to reexamine whether *Miranda's* protections are available to a suspect who made inculpatory statements to undercover police operatives while in custody.

## IV. The Court Properly Omitted any Instruction About Involuntary Manslaughter Based on a Self-Defense Theory

Carter argues the court erred in failing to instruct the jury sua sponte on attempted voluntary manslaughter as a lesser included offense of the charged attempted murders. We disagree.

19

### A. Relevant Proceedings

In his surreptitiously recorded conversations with undercover agents, Carter stated that during the restaurant shooting he was rushed by 15 to 20 people before he fired the shots. He claimed there was a "genocide" being committed against Black people, and stated he only ever shot in self-defense.

As relevant to the issue of self-defense, an eyewitness to the aftermath of the vehicle shooting testified that Carter's bike was lying on the ground, Carter was getting up, and his belongings were scattered. Martinez, the driver, admitted he drank alcohol that day, drove slowly in a circle around 1:00 a.m. near a closed parking lot before approaching Carter from behind, and lied to police about who had been driving.

As to the restaurant shooting, Soto testified he shouted a derogatory term at Carter.

As to the Busani shooting, an eyewitness testified that she saw two men engage in a shooting.

Carter intimates that these events constitute evidence of provocation.

The jurors were not instructed on attempted voluntary manslaughter as a lesser included offense of attempted murder (§ 192, subd. (a)) but were instructed that: "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated."

### B. Applicable Law

Attempted voluntary manslaughter is a lesser included offense of attempted murder. The only difference between the two offenses is that in the case of attempted voluntary manslaughter, the perpetrator acts without malice, attempting to kill either "upon a sudden quarrel or heat of passion" (§ 192,

20

subd. (a)) or in " 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense." (*People v. Moye* (2009) 47 Cal.4th 537, 549.)

" ' " 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' " ' [Citation.] Imperfect self-defense 'obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 648.) "This doctrine is a ' "narrow" ' one and 'will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that " ' "*must be instantly dealt with*." ' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 97-98.)

" '[I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter.  Thus the trial court must instruct on this doctrine . . . whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)  "The duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense." (*People v. Duff* (2014) 58 Cal.4th 527, 561.)

On appeal, "[w]e review de novo a trial court's failure to instruct on a lesser included offense" and, in doing so, "view the

21

evidence in the light most favorable to the defendant." (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

### C. Application

Here, there was no evidence that Carter shot at his victims because someone provoked him. There was no evidence that any victim assaulted or aggressed Carter, i.e., no evidence indicated that Martinez threatened Carter with his car, that Soto followed up on his verbal assault at the restaurant with aggressive behavior, or that the two men purportedly shooting at Busani were engaged in a struggle with each other. To conclude otherwise the jury would have to draw three inferences unsupported by any evidence: (1) Someone other than Carter acted aggressively; (2) that person provoked Carter; and (3) Carter actually feared for his safety. Because no evidence supported any of these inferences, no reasonable jury could conclude that Carter believed he was in imminent danger of death or great bodily injury when he fired his handgun.

Therefore, the court properly eschewed any instruction on attempted voluntary manslaughter/self-defense.

## V. The Sentence for Shooting at an Occupied Vehicle Must Be Stayed

For the vehicle shooting, Carter was charged with the attempted murders of driver Martinez and passengers, Jurado and Santos, and with shooting at the vehicle they occupied.

In sentencing, the court selected count 9 (the restaurant shooting) as the base, determinate count, imposing a midterm sentence of five years. The court imposed indeterminate life terms, plus enhancements, for the three attempted murder counts from the vehicle shooting, and added a consecutive 20-month term for shooting at an occupied vehicle.

Appellant contends the 20-month term for shooting at an occupied vehicle must be stayed.  Respondent concedes the point, and we agree.

Section 654 proscribes multiple punishment for the same conduct.  Here, Carter fired a handgun at the occupants of Martinez's car, and at the car itself, in an indivisible course of conduct.  The court imposed consecutive sentences when it should have stayed the term imposed upon the less serious offense of shooting at an occupied vehicle.  We will order the 20-month sentence stayed and direct the trial court to modify the abstract of judgment.

## VI.    Carter is Entitled to a Remand for Resentencing under Assembly Bill No. 124

Carter argues that a recent amendment to section 1170—Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Assembly Bill 124)—applies retroactively to his case, and this matter should be remanded for resentencing proceedings.  The Attorney General agrees Assembly Bill 124 has retroactive application to nonfinal judgments but argues Carter's sentence should be affirmed because the trial court already considered factors set forth in the bill.

### A.    Amendment to Section 1170

When Carter was sentenced on November 2, 2021, section 1170, subdivision (b) provided that when a penal statute specified three possible imprisonment terms (lower, middle, and upper), the trial court generally had broad discretion to select the term from that triad that best served the interests of justice.  (Former § 1170, subd. (b).)  The trial court was further required to specify the reasons for its sentencing decision.  (*Ibid.*)

23

On October 8, 2021, the Governor signed Assembly Bill 124 and Senate Bill No. 567 (2021-2022 Reg. Sess.); Statutes 2021, chapter 731, section 1.3 (Senate Bill 567) into law.

Senate Bill 567 basically established a preference for middle rather than higher terms.

Assembly Bill 124 amended section 1170 to add that "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term" if certain factors were "a contributing factor in the commission of the offense." (Stats. 2021, ch. 695, § 5.1, adding § 1170, subd. (b)(6).) As relevant here, those factors include the defendant having "experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (§ 1170, subd. (b)(6)(A).)

On January 1, 2022, Assembly Bill 124 and Senate Bill 567 went into effect.

The parties agree and we concur that the changes to section 1170 made by Senate Bill 567 and Assembly Bill 124 apply retroactively to nonfinal judgments because they operate to reduce punishment, and there is no evidence to rebut the presumption of retroactivity. (E.g., *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

### B.   Relevant Proceedings

The trial court sentenced Carter on November 2, 2021, after Assembly Bill 124 was signed but before it went into effect.

At sentencing, the court possessed only a 2015 pretrial probation report, which indicated Carter was homeless and had suffered a history of mostly misdemeanor offenses. The report

24

said nothing about psychological, physical, or childhood abuse, neglect, exploitation, or sexual violence.

In fashioning the sentence, the court selected the midterm for each of the three determinate counts—shooting at a restaurant, at an occupied vehicle, and at an occupied dwelling. As factors in aggravation, the trial court found: (1) The offenses showed planning and sophistication; (2) there was an increasing seriousness in Carter's criminal conduct; (3) the level of violence was high; and (4) the injuries suffered were serious. In mitigation, the court found that Carter suffered from drug addiction.

Regarding the new laws going into effect on January 1, 2022, the court stated: "I have also considered the things—the new statutes that will go into effect January 1 would ask me to consider, and I have not imposed any of those. I have not stricken any of those. I have considered all of those factors. I don't think they affect this case. . . . I did give the defendant mid-term as a consideration, not low term, because of the nature of the crimes involved."

Defense counsel made no argument at sentencing.

C.   **Standard of Review**

We review a trial court's sentencing decisions for abuse of discretion, evaluating whether the court exercised its discretion "in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.' " (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) "A failure to exercise discretion also may constitute an abuse of discretion." (*People v. Sandoval*, *supra*, 41 Cal.4th at pp. 847-848.) If the court failed to exercise newly granted discretion

in sentencing, remand for resentencing is required unless "the record contains" a "clear indication that the trial court will not exercise its discretion to reduce [the defendant's] sentence" under the new law.  (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 423.)

### D.    Application

Although the trial court did not explicitly reference Assembly Bill 124 when it sentenced Carter, it appears the court took the bill into consideration—it stated that it considered "the new statutes" and "all of those factors."  The court stated it imposed the "mid-term as a consideration," "not [the] low term" (apparently referencing an Assembly Bill 124 analysis), only because of the "nature of the crimes involved."

However, the record is not fully developed as to the relevant factors.  The 2015 probation report was prepared six years before Assembly Bill 124 was enacted, and gave no indication that factors made pertinent by that bill may have been investigated.  Further, the record is silent as to whether Carter's defense counsel even knew about Assembly Bill 124.  (See *In re Gay* (2020) 8 Cal.5th 1059, 1073 [constitutional right to the effective assistance of counsel ensures defendants the right to effective performance " 'assessed according to the prevailing norms at the time' "].)

We therefore doubt that the court's examination of what it called "those factors" constituted an exercise of informed discretion.  (See *People v. Flores* (2021) 63 Cal.App.5th 368, 385 [" ' "Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court" ' "].)  We find it further unclear whether the trial court, with the benefit of counsel prepared to address the new law, would reach

26

the same conclusion as to the determinate counts had the new law already been in effect.

We will therefore remand the matter for resentencing. On remand, trial counsel may ask the probation department to prepare an updated report and undertake relevant investigations aimed at exploring whether Carter's childhood or other circumstances qualify him for the new presumption. (See *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 755-756 ["the extent to which the homeless are confronted with persistent danger, as demonstrated by the evidence of the violence experienced by the homeless, and the psychological consequences of experiencing chronic homelessness, is beyond the ken of most"].) The trial court will then have the opportunity to exercise its informed discretion as to whether Assembly Bill 124's presumption applies in Carter's case.

## DISPOSITION

The convictions are affirmed. The matter is remanded for limited resentencing and correction of the abstract of judgment in accordance with the discussion above.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

WEINGART, J.

27